# United States Court of Appeals

*for the*

# Fifth Circuit

---

Case No. 25-20119

IN THE MATTER OF INSTANT BRANDS
ACQUISITION HOLDINGS INC. ET AL,

*Debtor,*

GUANGDONG MIDEA CONSUMER ELECTRIC MANUFACTURING
COMPANY LIMITED; FOSHAN SHUNDE MIDEA ELECTRICAL HEATING
APPLIANCES MANUFACTURING COMPANY LIMITED; MIDEA
ELECTRIC TRADING (SINGAPORE) CO. PTE LTD.,

*Appellants,*

v.

CORELLE BRANDS (TEXAS) INC.; CORELLE BRANDS ACQUISITION
HOLDINGS LLC; CORELLE BRANDS ACQUISITION INTERMEDIATE
HOLDINGS INC.; CORELLE BRANDS HOLDINGS INC.; CORELLE BRANDS
(CHARLEROI) LLC; CORELLE BRANDS LLC; CORELLE BRANDS
(CORNING) LLC; CORELLE BRANDS (LATIN AMERICA) LLC; EKCO
GROUP, LLC; EKCO HOUSEWARES, INC.; EKCO MANUFACTURING OF
OHIO, INC.; CORELLE BRANDS (CANADA) ULC; CORELLE BRANDS
(CANADA) HOLDING ULC; CORELLE BRANDS ULC; CORELLE BRANDS
(GHC) LLC; OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

*Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

## BRIEF FOR APPELLANTS

Brett D. Goodman
ArentFox Schiff L.L.P.
1301 Avenue of the Americas,
   42nd Floor
New York, New York 10019
(212) 484-3900

Matthew F. Prewitt
Michael N. Lloyd
ArentFox Schiff L.L.P.
Willis Tower
233 South Wacker Drive, Suite 7100
Chicago, Illinois 60606
(312) 258-5583

JAMES BRITTON
ARENTFOX SCHIFF L.L.P.
800 Boylston Street, 32nd Floor
Boston, Massachusetts 02199
(617) 973-6204

*Attorneys for Appellants*

 (800) 4-APPEAL • (381725)

## <u>CERTIFICATE OF INTERESTED PERSONS / DISCLOSURE</u>

Pursuant to Federal Rule of Bankruptcy Procedure 8012, Appellant GuangDong Midea Consumer Electric Manufacturing Company Limited, by and through its undersigned counsel, hereby states that it has no parent corporation, and no public corporation owns 10% or more of its stock.

Pursuant to Federal Rule of Bankruptcy Procedure 8012, Appellant FoShan ShunDe Midea Electrical Heating Appliances Manufacturing Company Limited, by and through its undersigned counsel, hereby states that it has no parent corporation, and no public corporation owns 10% or more of its stock.

Pursuant to Federal Rule of Bankruptcy Procedure 8012, Appellant Midea Electric Trading (Singapore) Co. Pte Ltd., by and through its undersigned counsel, hereby states that it has no parent corporation, and no public corporation owns 10% or more of its stock.

*/s/ Brett D. Goodman*
Brett D. Goodman

## <u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to Fed. R. App. P. 34 and Fed. R. Bankr. Proc. 8019(a), the Appellants respectfully request oral argument on this appeal.

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION ............................................................ 1

STATEMENT OF THE ISSUES ................................................................ 2

    1.    Did the District Court err when it found that the Bankruptcy Court did not err in entering its Order Denying Plan Objection [Bankruptcy Docket No. 1137], entered on February 23, 2024? ................................. 2

    2.    Did the District Court err in applying deferential review to the Bankruptcy Court's interpretation of the Supply Agreement between Debtors and Midea, when the Bankruptcy Court made no findings of fact and ruled on a stipulated record? .................................... 2

    3.    Did the District Court err when it found that the Bankruptcy Court did not err in entering its Findings of Fact, Conclusions of Law, and Order (I) Confirming the Joint Chapter 11 Plan of Reorganization of Instant Brands Acquisition Holdings Inc. and Its ebtor Affiliates and (II) Approving the Disclosure Statement on a Final Basis [Docket No. 1146], entered on February 23, 2024, to the extent, if any, that it holds that the Debtors and/or Reorganized Debtors may have ongoing rights to indemnity against Midea? .......................... 2

STATEMENT OF THE CASE ................................................................... 3

    A.    The Supply Agreement and the Parties' Course of Performance ............................................................ 3

        1.    The Supply Agreement's Comprehensive Framework ............................................................ 4

        2.    The Parties' Course of Performance with Purchase Orders. ............................................................ 6

        3.    The Supply Agreement's Indemnification Terms, and the Parties' Course of Performance Thereunder. ............................................................ 8

        4.    The Parties' Course of Performance in Previously Assigning the Supply Agreement Is Also Instructive...........................................................................9

  B.    The Bankruptcy Filing and Proceedings ...............................10

        1.    The Appliances Sale .........................................................11

        2.    The Original Plan & Preliminary Objections .................19

        3.    The Adversary Proceeding, and the Plan Stipulation .........................................................................21

  C.    The Indemnification Issue Briefing ......................................23

        1.    The Debtors Change Their Argument, Now Contending that they Possess "Contingent Indemnification Claims." .................................................23

        2.    The Bankruptcy Court Holds its Hearing and Shows Interest in the new Purchase Order Argument. ..........................................................................24

  D.    The Purchase Order Briefing and Tentative Ruling............25

  E.    The Confirmation Hearing and Appeal ................................28

  F.    The District Court Proceedings ............................................30

SUMMARY OF THE ARGUMENT .....................................................30

STANDARD OF REVIEW......................................................................37

ARGUMENT ...........................................................................................38

  I.    The Supply Agreement Incorporates All Purchase Orders into an Indivisible Contract....................................................38

    A.    Purchase / Work Orders Issued Pursuant to a Master Contract are Indivisible from the Master Contract When the Parties So Intended. ........................38

    B.    Here, both the Plain Language of the Supply Agreement and the Parties' Course of Performance Confirm Purchase Orders are Indivisible. ......................43

- iv -

1.  The Supply Agreement Repeatedly Indicates that Purchase Orders are Indivisible and Subordinate. ............................................................... 43

2.  The Parties' Course of Performance, Especially on Indemnity, Confirms the Parties' Intent. ........... 49

C.  The Bankruptcy Court Erred in Finding the Agreement's Completed Purchase Orders to be Divisible. .......................................................... 53

D.  The District Court Erred in Applying Deferential Review to the Bankruptcy Court's Determination that Purchase Orders were Severable. ........................... 57

1.  The Bankruptcy Court's Decision was decided as a Question of Law, not a Question of Fact. ......... 57

2.  The District Court Incorrectly Describes the Bankruptcy Court's Holding as a Finding of Fact, and Improperly Defers to its Legal Holding. ................................................................. 59

II.  The Bankruptcy Court's Ruling Would Create Untenable Uncertainty Among Contracting Parties. ........................... 62

CONCLUSION ......................................................................... 64

# <u>TABLE OF CITATIONS</u>

**Page(s)**

## Cases

*21st Mortg. Corp. v. Glenn (In re Glenn),*
   900 F.3d 187 (5th Cir. 2018)...............................................37

*Chapman v. Tyler Bank & Trust Company,*
   396 S.W.2d 143................................................................59

*Charleston Marine Container Inc. v. Sherwin-Williams Company,*
   165 F. Supp. 3d 457 (D.S.C. 2016) ......................................44

*Coon v. Schoeneman,*
   476 S.W.2d 439 (Tex. Civ. App. 1972), <u>writ refused</u>...........40

*In re EnergyTec,*
   739 F.3d 215 (5th Cir. 2013)...............................................38

*ENI US Operating Company, Inc. v. Transocean Offshore Deepwater Drilling, Inc.,*
   919 F.3d 931 (5th Cir. 2019)..................................32, 57, 60

*EPLET, LLC v. DTE Pontiac North, LLC,*
   984 F.3d 493 (6th Cir. 2021)..................................39, 40, 63

*Gonzalez v. Denning,*
   394 F.3d 388 (5th Cir. 2004)...............................................59

*In re Hawker Beechcraft, Inc.,*
   No. 12-11873, 2013 WL 2663193 (Bankr. S.D.N.Y. June 13, 2013) ........................................42, 43, 46, 55

*Johnson v. Walker,*
   824 S.W.2d 184 (Tex. App. – 2d District 1991), <u>writ denied</u> (Jan. 29, 1992) ........................................................40, 41

*In re KrisJenn, Ranch, LLC,*
   661 F. Supp. 3d 654 (W.D. Tex. 2023)..................................38

*Larbie v. Larbie*,
690 F.3d 295 (5th Cir. 2021)..........................................37, 60

*In re OCA, Inc.*,
552 F.3d 413 (5th Cir. 2008)............................................ 39

*P.C. Pfeiffer Co, Inc. v. Ford*,
444 U.S. 69 (1979) .......................................................... 46

*In re Perry*,
345 F.3d 303 (5th Cir. 2023)............................................ 37

*In re Philip Services (Delaware), Inc.*,
284 B.R. 541 (Bankr. D. Del. 2002), *aff'd* 303 B.R. 574 ....39-40, 44, 63

*Schneider National Transport v. Ford Motor Co.*,
280 F.3d 532 (5th Cir. 2002)............................................ 38

*Shell Western E & P, Inc. v. Pel-State Bulk Plant, LLC*,
509 S.W.3d 581 (Texas Ct. App. 2016)........................*passim*

*Stanley Works v. Wichita Falls Indep. Sch. Dist.*,
366 S.W.3d 816 (Tex. App. 2012) ..................................... 40

*Stewart Title Guar. Co. v. Old Republic Nat. Title Ins. Co.*,
83 F.3d 735 (5th Cir. 1996)..........................................39, 56

*Stonegate Fin. Corp. v. Broughton Maint. Ass'n, Inc.*,
*No.* 02-18-00091-CV, 2019 WL 3436616 (Tex. App. July
30, 2019) ....................................................................... 46

*Suggs v. Stanley (In re Stanley)*,
224 F. App'x 343 (5th Cir. 2007) ..................................... 37

*In the Matter of Thornhill Bros. Fitness*,
85 F.4th 321 (5th Cir. 2023) ........................................*passim*

*Tummel & Carroll v. Quinlivan (In re Quinlivan)*,
434 F.3d 314 (5th Cir. 2005)............................................ 37

*WBCMT 2007 C33 Office 9720, LLC v. NNN Realty Advisors, Incorporated*,
844 F.3d 473 (5th Cir. 2016) ................................................................ 45

*In re Wolflin Oil, L.L.C.*,
318 B.R. 392 (Bankr. N.D. Tex. 2004) ................................................ 39

## Statutes

11 U.S.C. § 365 .............................................................................. *passim*

United States Code title 11 chapter 11 ......................................... *passim*

TEX. BUS. & COM. CODE ANN. § 2.202 ....................................................... 49

## Other Authorities

BLACK'S LAW DICTIONARY 880 (10th ed. 2014) ........................................ 46

Federal Rules of Appellate Procedure 4(a) .................................................. 1

Federal Rule of Bankruptcy Procedure 9014 .......................................... 32

Federal Rule of Civil Procedure 44.1 ......................................................... 4

Federal Rule of Civil Procedure 52 .......................................................... 32

Michael J. Fisher & Desmond G. Greenwood, *Contract Law in Hong Kong* 363 (3d Ed. 2018) ......................................................... 38

UCC 2-207(2)(b) ........................................................................................ 26

Zimmerman, James M., *China Law Deskbook: A Legal Guide for Foreign-Invested Enterprises* 135 (2d ed. 2005) ........................... 3

# STATEMENT OF JURISDICTION

Appellants GuangDong Midea Consumer Electric Manufacturing Company Limited, FoShan ShunDe Midea Electrical Heating Appliances Manufacturing Company Limited, and Midea Electric Trading (Singapore) Co. Pte Ltd. (collectively, "Midea") appeal from the Memorandum Opinion and Judgment of the United States District Court for the Southern District of Texas, entered on March 26 and 27, 2025 respectively. The District Court's ruling addressed Midea's appeal of the decision of the Order Denying Plan Objection (the "Objection Order," ROA.7844) dated February 22, 2024 and (ii) the Findings of Fact, Conclusions of Law, and Order (I) Confirming the Joint Chapter 11 Plan of Reorganization of Instant Brands Acquisition Holdings Inc. and Its Debtor Affiliates and (II) Approving the Disclosure Statement on a Final Basis (the "Confirmation Order," ROA.8075) dated February 23, 2024, entered by the United States Bankruptcy Court for the Southern District of Texas (Isgur, J.) (the "Bankruptcy Court").

The subject Notice of Appeal was timely filed in accordance with Rule 4(a) of the Federal Rules of Appellate Procedure.

- 1 -

## STATEMENT OF THE ISSUES

1.  Did the District Court err when it found that the Bankruptcy Court did not err in entering its Order Denying Plan Objection [Bankruptcy Docket No. 1137], entered on February 23, 2024?

2.  Did the District Court err in applying deferential review to the Bankruptcy Court's interpretation of the Supply Agreement between Debtors and Midea, when the Bankruptcy Court made no findings of fact and ruled on a stipulated record?

3.  Did the District Court err when it found that the Bankruptcy Court did not err in entering its Findings of Fact, Conclusions of Law, and Order (I) Confirming the Joint Chapter 11 Plan of Reorganization of Instant Brands Acquisition Holdings Inc. and Its Debtor Affiliates and (II) Approving the Disclosure Statement on a Final Basis [Docket No. 1146], entered on February 23, 2024, to the extent, if any, that it holds that the Debtors and/or Reorganized Debtors may have ongoing rights to indemnity against Midea?

## STATEMENT OF THE CASE

### A.    The Supply Agreement and the Parties' Course of Performance

Before selling their appliances business in the Appliances Sale Transaction,[1] the Debtors sold the InstaPot, a multi-function cooker that includes pressure cooker functions, pursuant to a Supply Agreement dated July 28, 2016 (the "Supply Agreement") between Midea and Instant Brands Inc. (at the time, known as Double Insight, Inc.). (ROA.8784–8785).  The Supply Agreement contained carefully drafted commercial terms and conditions throughout, and was sealed with Midea's corporate "chop," which is used to execute enforceable contracts in China and signifies execution by an authorized legal representative. (ROA.11036).[2]

---

[1] Unless otherwise provided herein, any capitalized terms used but not defined shall have the meanings ascribed to them in the *Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization of Instant Brands Acquisition Holdings Inc. and its Debtor Affiliates* (the "Plan") (ROA.8743).

[2] See James M. Zimmerman, *China Law Deskbook: A Legal Guide for Foreign-Invested Enterprises* 135 (2d ed. 2005) ("After a company is established [in China], it is required to obtain several sets of 'chops' or 'seals,' which are issued by an engraving entity approved by the Ministry of Public Security (MPS) or local branch thereof. . . . The company will also be issued an 'enterprise' seal, which is usually held by a legal representative and is used for executing contracts and other obligations.  Given that a chop imprint — and especially the imprint of the enterprise seal — is a substitute for a signature, due care must be exercised to ensure that the chops are maintained in a safe location and are not subject to misuse by persons without authority").  "In

The Supply Agreement is ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

(ROA.11048).   Because the Debtors filed for bankruptcy in the United

States, and the assignability of the Supply Agreement became an issue

under Federal bankruptcy law, the Bankruptcy Court had jurisdiction to

decide only that limited issue as part of its resolution of the proceedings.[3]

### 1.    The Supply Agreement's Comprehensive Framework.

The Supply Agreement makes clear that it is the master document

governing the parties' contractual relationship.    It provided a

comprehensive system for the parties' commercial relationship, with

specific procedures for placing, acknowledging, and fulfilling orders;

---

determining foreign law," federal courts "may consider any relevant material or source." Fed. R. Civ. P. 44.1.

[3] As Midea has consistently asserted, the Bankruptcy Court has jurisdiction to determine only whether the Supply Agreement was or was not assigned *in toto*, including whether any indemnity rights thereunder could be separated from the Supply Agreement.  Any issues with respect to the actual availability, scope, or application of indemnity rights under the Supply Agreement must be decided by ███████████████████████ pursuant to the Supply Agreement.  Midea expressly reserves, and does not waive, any objections it has raised or may raise with respect to jurisdiction of this Court and/or the District Court or Bankruptcy Court or any attempt to adjudicate issues that the Supply Agreement requires to be ████████████ ███████████████████ (*See* ROA.13411–13413, ROA.13446.)

additional procedures for asserting and defending claims; and a carefully crafted allocation of rights, duties, and liabilities. Pursuant to Section 1.1, Instant Brands Inc. and, following the 2022 assignment, Instant Brands LLC (in each case, Midea's singular "Customer," as defined in the Supply Agreement) began the order process by ████████████████ ████████████████████████████████ ██████████ (ROA.11037, Section 1.1). But this was not enough to effectuate a purchase, as the Supply Agreement expressly stated. ████ ████████████████ Midea (the "Supplier" as defined in the Supply Agreement), ████████████████████████ ████████████████████████████████ (ROA.11037, Section 1.2). The ████████████████████ ████████████████████████████████ (ROA.11037, Section 1.2).

The Supply Agreement does not provide that purchase orders were in any way separate or divisible from the Supply Agreement. To the contrary, the Supply Agreement expressly ████████████████████ ████████████████████████████████ ██████████ (ROA.11037, Section 1.3). Section 17.2 of the Supply

Agreement states that 

(ROA.11049) (emphasis added).  Lest there be any doubt as to intention,

Section 17.7 is an integration clause which provides:



(ROA.11049) (emphasis added).

> 2.    The Parties' Course of Performance with Purchase Orders.

The parties' course of performance with purchase orders confirms

that the terms of the Supply Agreement, and only the Supply Agreement,

governed their performance.  The parties stipulated that the limited

sample of purchase orders in the evidentiary record were authentic and

representative of their mutual performance under the Supply

Agreement. (ROA.13121).  Instant Brands submitted purchase orders by

having employees email a Midea sales representative attaching a form with the information required by the Supply Agreement (ROA.13124).

The purchase orders sometimes contained boilerplate referencing additional terms and conditions that varied from the provisions of the Supply Agreement in some respects. (e.g., ROA.13148–13150). Sometimes Debtors' purchase orders attached a website reference for these alleged terms; sometimes they provided nothing at all. (e.g., ROA.13178–13189).

However, the boilerplate terms Instant Brands sometimes appended were ignored by everyone. At all times, Midea's employees would acknowledge receipt of a purchase order by email saying "received." (ROA.13147, 13152, 13157, 13163, 13175). The orders were then handled in accordance with the process outlined under the Supply Agreement. At no time were any additional terms and conditions deemed "accepted" by any authorized executive. Nor were the purchase orders or their occasional added terms approved by application of Midea's chop or referenced by the parties in their indemnity transactions. Rather, Instant Brands and Midea knew that the terms of the Supply Agreement controlled the parties' relationship (including the ordering process).

Indeed, they always operated accordingly, which made Customer's always-subsequent acceptance of a Midea-issued PI the confirmation of their agreement as to any individual shipment.[4]

       3.    <u>The Supply Agreement's Indemnification Terms, and the Parties' Course of Performance Thereunder.</u>

Indemnification rights and claims were always asserted and tendered by the Debtors pursuant to the Supply Agreement. Section 6 of the Supply Agreement provides detailed provisions about how product liability would be handled between Midea and its then-Customer (i.e. Instant Brands). (ROA.11041). The Supply Agreement provides that Customer is required to ███████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ██████████████████████ (ROA.11041, Section 6.1). Midea agreed to ████████████████████ to such claims. (ROA.11041, Section 6.2). Section 5 of the Supply Agreement provided an analogous framework for ████████████████████████████████████ ████████████████ (ROA.11040).

---

[4] The Bankruptcy Court correctly found that the purported additional terms and conditions never became part of any agreement between Midea and the Debtors, and that finding has never been challenged or appealed. ROA.10473.

Until the bankruptcy stayed further litigation, the Debtors tendered claims to Midea for indemnity exclusively pursuant to the Supply Agreement.  In each tender, the Debtors' representative stated that "[p]ursuant to its supply agreement with Midea, Instant Brands tenders defense of the attached claim[.]" (ROA.13133, 13139, 13143).  In accepting, Midea's representative always responded that "Midea agrees to accept your tender of defense subject to the terms of the Supply Agreement." (ROA.13131, 13137, 13142).  In the Bankruptcy Case, the parties stipulated that tenders were always made "pursuant to the terms of the Supply Agreement," (ROA.13123), as opposed to any purchase order.

4. <u>The Parties' Course of Performance in Previously Assigning the Supply Agreement Is Also Instructive.</u>

The Debtors assigned the Supply Agreement from one Debtor entity to another in January 2022.  Pursuant to an Assignment and Assumption Agreement with Novation dated as of January 2, 2022 (the "<u>Pre-Petition Assignment Agreement</u>"), Instant Brands Inc. (formerly known as Double Insight Inc.) assigned the Supply Agreement to Instant Brands LLC (formerly known as Corelle Brands LLC), with Midea's consent. (ROA.13211).  The Pre-Prepetition Assignment Agreement assigned

"that certain contract as described on schedule 1 attached hereto (the 'Assigned Contract')[.]" (ROA.13211).   Schedule 1 to the Pre-Petition Assignment Agreement listed only the Supply Agreement.  (ROA.13218). Purchase orders previously placed under the Supply Agreement were not listed, and no party has argued they failed to transfer as part of the Pre-Petition Assignment Agreement.  Like the Supply Agreement, and unlike any of Debtors' purchase orders, the Pre-Petition Assignment Agreement was authorized with Midea's corporate "chop."  (ROA.13217).

Notably, the Pre-Prepetition Assignment Agreement includes specific provisions clarifying that the assignee Customer would inherit all liabilities of the assignor Customer, and in turn Midea would therefore continue to indemnify against those liabilities, despite those liabilities being incurred by the former Customer.  (ROA.13211–1212, §§ 1.2, 2.1.)  As explained below, because the Appliances Buyers in contrast did not assume pre-closing liabilities of the Debtors, the Appliances APA with the Appliance Buyers contained no such provision.

## B.   The Bankruptcy Filing and Proceedings

On June 12, 2023, the Debtors filed for protection under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the

Bankruptcy Court, initiating the cases jointly administered under Case No. 23-90716 (the "Bankruptcy Case") (ROA.34, 165).

1.     The Appliances Sale

On June 30, 2023, the Debtors sought approval to sell substantially all their assets, broadly divided into a "housewares business" and an "appliances business." (ROA.508).   The assets to be sold with the appliances business included Midea's Supply Agreement, requiring the Supply Agreement's assumption and assignment pursuant to Section 365 of the Bankruptcy Code.  (ROA.869).

a.     *Critical Vendor Treatment and Notices of Possible Assumption*

On July 25, 2023, as part of the sale process, the Debtors filed a notice of potential assumption and assignment of executory contracts which included the Supply Agreement and four other contracts with Midea, to be assumed and assigned to a buyer.  (ROA.844, 867, 869, 884). No purchase orders issued by the Debtors to Midea were included in this notice.   Of those five contracts, only the Supply Agreement included a corresponding proposed cure amount of $11,111,684.49 (on account of unpaid amounts due and owing on prior orders placed by the Debtors).

On July 28, 2023, Midea received a letter from Instant Brands indicating that Midea had a prepetition claim of $16,106,312, of which $4,994,628 had been paid pursuant to the Bankruptcy Court's critical vendor order, leaving a remaining prepetition claim outstanding of $11,111,684 (ROA.11181). According to this letter, the outstanding balance would be paid to Midea so long as Midea agreed to resume production and shipment on customary payment terms set forth in that letter. (ROA.11181–11182). Midea countersigned that letter agreement on July 31, 2023. (ROA.11183). Following an addendum that was fully executed on August 6, 2023, the $11,111,684 was paid to Midea. (ROA.11185).

Thereafter, two additional notices of potential assumption and assignment were filed in the Bankruptcy Case — one on August 31, 2023 and one on September 28, 2023. Both included the same five contracts with Midea. (ROA.11188, 11343). Having received payment of the remaining balance of Midea's prepetition claim, the corresponding entries for the Supply Agreement reflected a $0.00 proposed cure amount. (ROA.11217, 11372).

Despite including purchase orders with other counterparties in some of these notices, the Debtors never listed a single purchase order with Midea. The reason purchase orders with Midea were intentionally omitted was because the aggregate amount due and owing with respect to the purchase orders, i.e. $11,111,684, was considered an obligation due and owing under the Supply Agreement and was required to be cured *in toto* in connection with the Supply Agreement's assumption and assignment.

b.    *The Court-Approved Terms for the Sale*

As part of the Appliances Sale Transaction, the Debtors expressly transferred the Supply Agreement to the Appliances Buyers while retaining pre-closing liabilities arising from the Supply Agreement. (ROA.11686–11687).   On October 3, 2023, the Bankruptcy Court approved the sale of the appliances business to the Appliances Buyers pursuant to the Sale Order (ROA.11387).  This Sale Order authorized the sale of the Debtors' appliances business to the Appliances Buyers pursuant to the terms of the Appliances Asset Purchase Agreement (the "Appliances APA"), attached to the Sale Order as Exhibit "B." (ROA.11650).

Paragraph 29 of the Sale Order provided that "[t]he Debtors are hereby authorized and . . . directed . . . to (a) assume and assign . . . (ii) to the Appliances Buyer, effective upon the payment of the Appliances Cure Costs and the closing of the Appliances Sale or any later applicable effective date, the Proposed Assumed Appliances Contracts."[5] (ROA.11442).   The Supply Agreement was listed as a "Desired 365 Contract" on Schedule 2.05(a) to the Appliances APA and therefore was an "Asset" that was purchased by, and assumed and assigned to, the Appliances Buyers through the Appliances APA.   (ROA.2096, 11088, 11686).   The Appliances APA did not list any individual purchase orders as assets under the Supply Agreement, completed or open.

Section 2.01(b)(ix) of the Appliances APA provided that "Assets" sold included "all rights of indemnity, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery . . . possessed by any Selling Entity (regardless of whether such rights are currently exercisable) associated with the Assets." (ROA.11681–11682). Section 2.01(b)(xi) further stated that "Assets" sold included "all

---

[5] The Sale Order defines the Proposed Assumed Appliances Contracts as the Desired 365 Contracts (as defined in, and as modified in accordance with, the Appliances APA and the Sale Order).

warranty or indemnity claims that may be made against any Person, other than Seller or any Affiliate thereof, under any Assigned Contract, in each case, Related to the Business, or any products or services provided in connection therewith." (ROA.11682).

As part of the bargain between the Appliances Buyers and the Debtors (and substantial cash consideration paid), the Appliances APA also provided for Excluded Liabilities to be left behind with the Debtors. Section 2.04 defined "Excluded Liabilities" to be "any Liability of a Selling Entity other than the Assumed Liabilities." (ROA.11686). "Assumed Liabilities" was defined in Section 2.03, and included "[a]ll Liabilities directly arising from the ownership or operation of the Business or the Assets by Buyer after the Closing," and "[a]ll of the Seller Entities' Liabilities under the Assigned Contracts, to the extent arising or attributable to any period after the Closing or arising on or prior to the Closing solely to the extent requiring performance after the Closing[.]" (ROA.11685–11686).

Attached as Exhibit "B" to the court-approved Appliances APA was a "Form of Master Assignment, Bill of Sale, Deed, and Conveyance" (the "Form MAA") (ROA.11782).  The Form MAA provided that:

- 15 -

> As of the date hereof, upon the terms and subject to the conditions set forth in the Purchase Agreement, each Selling Entity hereby irrevocably sells, assigns, transfers, conveys and delivers to Buyer . . . each of the Selling Entities' respective right, title and interest in, to and under all of the Assets, in each case free and clear of all Encumbrances (other than Permitted Encumbrances).

(ROA.11782). The Form MAA was the only version of the document filed on the docket by the Debtors before the Appliances Sale Transaction closed. Although the Sale Order was entered on October 3, 2023, the Appliances Sale Transaction did not close until November 8, 2023. (ROA.8140).

> c.    *The Sale Terms are Secretly Changed without Notice to Midea.*

On November 27, 2023, Midea for the first time saw a redacted copy of a *revised* form of the Master Assignment, Bill of Sale, Deed, and Conveyance (the "MAA 2.0"). MAA 2.0 materially differed from the Form MAA that had been filed with the Bankruptcy Court. In contrast to the straightforward assignment language of the Form MAA, MAA 2.0 provided that:

> As of the date hereof, upon the terms and subject to the conditions set forth in the Purchase Agreement, each Selling Entity hereby irrevocably sells, assigns, transfers, conveys and delivers to Buyer . . . all of the Selling Entities' respective right, title and interest in, to and under all of the Assets . . . . ***Notwithstanding anything to the contrary in this***

- 16 -

*Agreement or the Purchase Agreement, solely with respect to those supply or manufacturing agreements described on Exhibit A hereto (each a "Supply Agreement" and collectively, the "Supply Agreements"), such assignment shall not apply with respect to the Selling Entities' rights, claims and causes of action under each Supply Agreement based on facts and circumstances arising, or the extent attributable to any Excluded Liabilities,* ██████████████████████████████

██████████████████████████████████████ *(each, "Retained Supply Agreement Claim"), including Retained Supply Agreement Claims* ██████████████

██████████████████████████████ *The Selling Entities acknowledge that, as a result of the assignment of the Supply Agreements hereunder, from and after the Closing, Buyer will be the contracting party under the Supply Agreements*, and as such, the Selling Entities agree prior to making any Retained Supply Agreement Claim to consult in good faith with Buyer and consider Buyer's views in good faith, and to the extent feasible and commercially practicable, reasonably cooperate with Buyer to minimize any disruption to the Business as a result of any such Retained Supply Agreement Claim. In addition, should the Selling Entities make any Retained Supply Agreement Claim, the Selling Entities shall keep Buyer reasonably informed on a periodic basis of the status of such claim, including at Buyer's request, having periodic update calls on such matters, and the Selling Entities shall reasonably consider any suggestions made by Buyer in good faith. For the avoidance of doubt, the Retained Supply Agreement Claims shall be deemed to be Excluded Assets for all purposes under the Purchase Agreement and this Agreement, and Buyer shall reasonably cooperate with the Selling Entities, at the Selling Entities' sole cost and expense, in exercising and enforcing any Retained Supply Agreement Claim, including, to the extent applicable, by using commercially reasonable efforts to

> exercise and enforce such Retained Supply Agreement Claim on behalf of, for the benefit of and at the direction of the Selling Entities.

(ROA.11080–11081) (emphasis added).   The term "purchase order" is not used in MAA 2.0.  Midea was not provided with an unredacted version of MAA 2.0 until December 28, 2023.   (ROA.11828).

Under the terms of the Form MAA approved by the Bankruptcy Court, all indemnity rights under the Supply Agreement vanish from the Debtors, who are no longer the Supply Agreement's Customer, and transfer in their entirety to the Appliances Buyers, Midea's replacement Customer, as required by Section 365 of the Bankruptcy Code and *In the Matter of Thornhill Bros. Fitness*, 85 F.4th 321 (5th Cir. 2023).  However, under MAA 2.0, the Debtors secretly attempted to splice the Supply Agreement to allow for two Customers rather than one, with Debtors somehow having assigned the Supply Agreement pursuant to Section 365 (which requires transfers *in toto*) yet remaining a Customer entitled to ongoing indemnity at the same time.  Even the Debtors' rewrite of the Form MAA that resulted in MAA 2.0 refers only to "Supply Agreements" and fails to even mention purchase orders or any rights or claims arising therefrom.

### 2.  The Original Plan & Preliminary Objections

Following the clandestine MAA 2.0, on December 22, 2023, the Debtors filed their original combined disclosure statement and plan of reorganization (the "Original Plan") (ROA.3673), which included provisions retaining rights to seek indemnity from Midea despite its Supply Agreement with the Debtors having been assigned.  (ROA.3751).

Midea and another appliances supplier, Zhejiang Tianxi Kitchen Appliance Co., Ltd ("Tianxi," and together with Midea, the "Objecting Suppliers") each filed preliminary objections to the Original Plan on January 6, 2024 (the "Preliminary Objections") (ROA.9756, 9773).  The Preliminary Objections highlighted the fact that MAA 2.0, which purported to carve out indemnification rights from purchased assets, was never noticed to parties in interest or filed on the docket, and attempted to improperly modify the terms of the Sale Order which had approved the Appliances APA attached thereto.  (ROA.9755–9757).

The Preliminary Objections emphasized that the Original Plan's attempted retention of Third Party Indemnifications for the benefit of the Debtors and/or product liability plaintiffs violated the Bankruptcy Code and applicable Fifth Circuit law, because all such rights had necessarily

been assigned with the underlying contracts (i.e. the Supply Agreement) when they were assumed and assigned to the Appliances Buyers. (ROA.9763–9765). Because an executory contract like the Supply Agreement must be assumed and assigned *in toto*, the retention of any portion thereof would be an impermissible partial assignment. Indeed, this Court's decision in *Thornhill*, handed down shortly before the appliances sale closed on November 8, specifically concerned an attempt to carve out indemnification rights from an otherwise-assigned executory contract, and rejected it as improper. (ROA.9764).

Debtors responded on January 8, 2024, agreeing that the Supply Agreement was required to be and therefore was assigned *in toto*, and that its provisions could therefore be enforced only by the Appliances Buyers. (ROA.9785–9786). However, the Debtors contended that notwithstanding this complete assignment, "certain claims that arose under the contracts before the assignment remain with the Debtors as Assets of the Estates." (ROA.9791). The Debtors described these alleged "Assets" as "matured pre-assignment rights under the Third-Party Indemnifications arising out of such agreements with respect to products purchased or sold prior to the assignment." (ROA.9788).

3.    <u>The Adversary Proceeding, and the Plan Stipulation</u>

On January 16, 2024, the Objecting Suppliers filed an Adversary Complaint against the Debtors, initiating Adversary Proceeding No. 24-03007 (the "<u>Adversary Proceeding</u>").  The Adversary Complaint asserted that the Debtors' attempts to retain indemnity rights under the Supply Agreement were legally invalid, and that the secret modifications to the Appliances APA and the Form MAA, made without notice to other affected parties, were made in bad faith and violated due process.[6]

To streamline adjudication of the dispute, and to allow the Appliance Buyers' purchase to remain a going concern, on January 27, 2024, the Debtors, the Objecting Suppliers, and the Official Committee of Unsecured Creditors entered a *Joint Stipulation and Agreed Order Regarding Discovery and Plan Objection Briefing* (the "<u>Plan Stipulation</u>") (ROA.9866).  The Plan Stipulation provided a structured framework for

---

[6] The Adversary Complaint brought four counts for declaratory relief against the Debtors: (i) a Declaratory Judgment that Defendants Assumed and Assigned the Supply Agreements In Toto; (ii) a Declaratory Judgment that Defendants Cannot Retain, Assert, and/or Assign any Indemnity Rights and/or Causes of Action Under Plaintiffs' Supply Agreements; (iii) a Declaratory Judgment that Any Claims Defendants May Have Held Against Plaintiffs Under the Supply Agreements Are No Longer Enforceable; and (iv) a Declaratory Judgment that [the Revised MAA] is Invalid and Ineffective."  (ROA.9855–9859).  Count IV of the Adversary Complaint in particular alleged bad faith and lack of due process in connection with MAA 2.0 and its lack of disclosure.  (ROA.9859–9865).

resolving the Objecting Suppliers' legal objections to the Plan and the corresponding counts of the Adversary Proceeding that would accommodate the Debtors' Plan confirmation schedule, while preserving but staying the Objecting Suppliers' factual contentions, such as their count alleging bad faith, to be resolved post-confirmation if necessary. (ROA.9869–9870).   The factual contentions in the Adversary Complaint have never been adjudicated, nor have they ever been waived or withdrawn, and the Adversary Proceeding remains pending but stayed pursuant to the Plan Stipulation.   This allowed the purely legal issue of whether the Debtors retained indemnity rights from the Supply Agreement to be addressed while the other disputes raised by the Adversary Complaint were put on hold.

The Bankruptcy Court adopted the Plan Stipulation on January 31, 2024.   (ROA.9866).   Paragraph 2 of the Plan Stipulation provides, in relevant part, that:

> The Parties shall file briefing with respect to the Suppliers'
> Plan Objection on the issues of whether the Debtors assumed
> and assigned the ***Supply Agreements*** in toto; whether the
> Debtors can retain, assert, and/or assign any indemnity rights
> and/or causes of action under the ***Supply Agreements***,
> including, but not limited to, any ***"Retained Supply
> Agreement Claim;"*** whether any claims Debtors may have
> held against the Objecting Suppliers are no longer enforceable

and now cannot be liquidated; and whether the Master
Assignment 2.0 (as defined in the Suppliers' Adversary
Complaint) violated the Bankruptcy Code and/or Court's Sale
Order as a matter of law (collectively, the **"Phase One
Topics"**). . . .

ROA.9869 (emphasis added).  Once again, the term "purchase order" is

not included anywhere in the Plan Stipulation.

### C.    The Indemnification Issue Briefing

#### 1.    <u>The Debtors Change Their Argument, Now Contending that they Possess "Contingent Indemnification Claims."</u>

The following weeks forced Midea to play the legal equivalent of

"whack-a-mole," as parties who supported the Plan (and specifically MAA

2.0) workshopped shifting theories, regardless of what Midea and the

former Double Insight, Inc. actually had agreed to.  The "matured pre-

assignment rights" theory featured in Debtors Response to Midea's

Preliminary Objections (ROA.8789, 9788) was the first of many such

theories.

On January 27, 2024, the Debtors changed their tune: instead of

"matured indemnification rights," the Debtors characterized their

alleged indemnification rights as "claims under a contract" which could

be retained.  Under this new theory, they argued indemnification rights

were "discrete prepetition property interests of the debtor that arise from

contractual relationships," which rather than "matured" indemnification rights, instead were "contingent indemnification claims or causes of action that arose prior to the assignment of an underlying contract." The Debtors also mentioned in a footnote that Debtors' purchase orders had occasionally (but not always) attached boilerplate Terms and Conditions that purportedly claimed broader indemnity protections than those stipulated by the Supply Agreement, but that also varied in content even when additional Terms and Conditions were attached. (ROA.12119).

The Ad Hoc Group of Crossover Lenders, who were not a party to the Supply Agreement and thus had no idea what the parties to the Supply Agreement intended, filed their own brief contending that the Supply Agreement made purchase orders divisible contracts that created independent indemnity obligations. (ROA.10995).

> 2. <u>The Bankruptcy Court Holds its Hearing and Shows Interest in the new Purchase Order Argument.</u>

The Bankruptcy Court held a continued hearing on February 9, 2024.[7] The Bankruptcy Court reasoned that the "purchase order theory" advanced by the Ad Hoc Group of Crossover Lenders — not the Debtors

---

[7] It was announced at the February 9, 2025 hearing that Tianxi had settled its claims against the Debtors (per Stipulation filed on February 21, 2024). (ROA.13763).

— was a "completed contract theory," and the Bankruptcy Court viewed the existence of completed purchase orders as dispositive:

> If a completed purchase order is an independent contract, then they can have an assignment — that was an "if." They can then assign the supply agreement, but have a separate contract that might still have the indemnity provision or that does still have the indemnity provision under their argument under the very terms of the assigned contract. It is a separable and separate contract, which by the way in my view today is no longer executory. It's just a contract where there's only a unilateral obligation on your client's part to provide indemnity if they're corrected. It's a separable contract.

(ROA.10378). The Bankruptcy Court ordered additional briefing on the purchase order issue and scheduled a follow-up hearing for February 15, 2024.

### D.   The Purchase Order Briefing and Tentative Ruling

The Debtors and Midea filed a Joint Stipulation Regarding Exhibit Lists on February 13, 2024, which stipulated to the limited record for the February 15 hearing. The Stipulation provided what the parties agreed were representative samples of, among other things, purchase orders and attached terms and conditions, if any, that were sent from the periods before and after April 2022. (ROA.13123–13124).

Midea filed its Supplemental Brief in Support of Its Plan Objection on February 13, 2024. (ROA.13390). This brief argued that "[t]he

purchase orders were necessarily assigned along with the Supply Agreement because they are indivisible from the Supply Agreement," and "[u]nder applicable non-bankruptcy law, the critical inquiry is whether the parties intended the Supply Agreement and purchase order to be treated as one contract" which "they undoubtedly did." (ROA.13395).

Midea pointed to the language of the Supply Agreement itself, which provided that the purchase orders were part of the Supply Agreement, as well as the parties' conduct (including every indemnity tender from Debtors, their own pre-bankruptcy assignment of the Supply Agreement in 2022, and the notices of assumption and assignment in the Bankruptcy Case), which always treated the Supply Agreement as the only agreement between the parties, and never mentioned purchase orders. (ROA.13401–13405).

Midea also observed that any alleged terms and conditions attached to purchase orders materially contradicted the terms of the Supply Agreement itself. As a result, Midea argued that pursuant to the UCC's "battle of the forms" rule (UCC 2-207(2)(b)), such inconsistent terms were never accepted by the Debtors and never became a part of any agreement.

(ROA.13410–13411).  The Bankruptcy Court ultimately agreed with this

argument.

The Bankruptcy Court held its follow-up hearing on February 15,

2024.    After hearing argument, the Bankruptcy Court issued the

following preliminary ruling:

> When an executory contract is rejected, assumed, assigned, it
> doesn't matter, that contract remains, it exists in the world.
> And it exists in this circumstance.  It's just that the Debtor no
> longer has rights or duties under that contract.  There is very
> little question in my mind that the purchase orders are
> separable contracts under applicable law, such that the
> assumption and assignment of the agreement did not assume
> and assign completed purchase orders.  And I think that the
> right indemnity answer is that the purchase orders are
> complete and can still be interpreted and referenced by
> looking at the assumed and assigned contract, so that the
> purchase orders go out, they're completed, and they're no
> longer executory, they are separable.  But when you read
> what they mean, you read what they mean in the context of
> the supply agreement.    You don't ignore the supply
> agreement.  And the fight over whether we look to them as
> not governed by the supply agreement is different than the
> fight over whether they are interpreted in accordance with the
> supply agreement.  So I think that the indemnity provisions
> remains and they remain with the separable purchase orders.
> I don't think that the additional terms and conditions can
> modify the parties' intent, unless they are accepted.  And at
> least at this point, I'm not confident that they have been
> accepted by Midea, which means you look to the original
> purchase agreement to define what those terms mean.  And
> so, when you have a purchase order, it comes with indemnity,
> no problem.  It's a non-executory, separable agreement.

(ROA.10472–10480). In essence, the Bankruptcy Court rejected Debtors' claim that the purchase orders could impose new indemnity obligations different from those agreed to in the Supply Agreement (the argument that the Debtors finally settled upon, and the argument that the limited stipulated record between the Debtors and Midea was premised upon). Instead, it patched together a new contractual arrangement that did not previously exist, putting together parts of both the Supply Agreement and what it deemed as inescapable legal facts about the purchase orders while ignoring other parts of both.

### E.    The Confirmation Hearing and Appeal

The Bankruptcy Court held a hearing to consider confirmation of the Plan on February 22, 2024. At the hearing, the Bankruptcy Court stated "I did read the cases and the ruling I made was correct. . . . And I'm very confident now in the ruling." (ROA.10493). The parties consensually resolved Midea's remaining plan objections through reading certain language into the record concerning the Debtors' understanding of the Plan's discharge provisions. (ROA.10493).

The Bankruptcy Court also contemplated the possibility that its holding would be reversed on appeal:

> In terms of our ruling on whether the purchase orders are their own contracts, et cetera, you're reserving the right to appeal that. That's fine with me. But then you said that won't affect confirmation, and I want to know if there is an agreement by all parties that it won't affect confirmation, so that if, for example, we get reversed on that ruling and it turns out that everything was assigned over, including the indemnity rights and so they don't apply, is everyone agreeing that confirmation doesn't cut off that argument?

(ROA.10498). The Debtors agreed that a reversal of the Bankruptcy Court's ruling would not affect or be affected by confirmation of the Plan. (ROA.10499–10500). If reversed, any retained liabilities that Debtors had sought to pass on to Midea through indemnification would be the (Reorganized) Debtors' problem, not Midea's problem, and the creditors could not seek to undo the Debtors' reorganization and emergence from bankruptcy.

The Bankruptcy Court subsequently issued its Objection Order and the Confirmation Order.[8] Midea timely filed its Notice of Appeal on March 6, 2024, initiating its appeal to the United States District Court for the Southern District of Texas. (ROA.8915).

---

[8] Pursuant to the Plan Stipulation, Paragraph 31 of the Confirmation Order also provided that nothing in the Plan "shall affect, impair, diminish, or otherwise moot . . . any appeal of the Bankruptcy Court's ruling or order resolving any portion of the Suppliers' Adversary Complaint in the Suppliers' Adversary Proceeding and/or the Suppliers' Plan Objection . . . ." (ROA.8736).

**F.     The District Court Proceedings**

The District Court affirmed the Objection Order in a Memorandum Opinion and Order.  (ROA.10770).

Because the Objection Order determined the legal meaning and effect of the Supply Agreement, both sides agreed in their briefing that the correct standard of review was *de novo*.  (ROA.8642, 10580).  Without acknowledging the parties' agreement to the contrary, the District Court surprisingly chose to review the Objection Order under a clearly erroneous standard instead.  (ROA.10776).  After identifying certain provisions of the Supply Agreement that, in its view, arguably supported the conclusion of the Objection Order — but ignoring those provisions explicitly saying otherwise — the District Court declared the Bankruptcy Court "did not clearly err" in finding the Supply Agreement's purchase orders to be divisible, and entered Judgment in favor of the Appellees. (ROA.10776–10777).

Midea timely filed its Notice of Appeal to this Court.

## SUMMARY OF THE ARGUMENT

The Bankruptcy Code does not empower a bankruptcy court to change the meaning of a contract negotiated by two sophisticated companies to benefit a Debtor.  Midea and Debtor's predecessor (the

Customer) entered into a written and sealed Supply Agreement that set the terms and conditions under which Supplier would manufacture pressure cookers for a single, defined Customer. Merchandise requests were to be placed by purchase order that by itself could not create a binding order. The Supply Agreement explicitly provided — twice — that purchase orders were incorporated into the Supply Agreement. There is no provision of the Supply Agreement stating that purchase orders are to be treated as separate or divisible from the Supply Agreement, or that a completed purchase order had different legal rights than an open one.

To the contrary, any assignment of the Supply Agreement was required to be in its entirety to the new Customer and the assignment would automatically include any purchase orders. When seeking indemnity, the Debtors always submitted, and Midea always accepted, those requests by referencing the Supply Agreement, and never any purchase order. The Supply Agreement did not contemplate ongoing obligations to any former Customer once the Supply Agreement was assigned in its entirety: this is why, when executing the Pre-Petition Assignment Agreement, Debtors and Midea had to add additional provisions allowing Midea's new Customer (Debtor Instant Brands LLC)

to accept legacy liabilities and for Midea to indemnify them. Midea's indemnity obligations always attached from the point of assignment forward to certain liabilities of its one contract counterparty.

The Bankruptcy Court disregarded the language of the Supply Agreement, holding that completed purchase orders placed by the Debtors could instead be viewed as *per se* separate, divisible, non-executory contracts that continued to offer the Supply Agreement's indemnity protections even after the Supply Agreement was assigned *in toto* to a new customer. In essence, the Bankruptcy Court concluded that the stated intent of the parties to a contract does not matter. No factual findings were made in support of this ruling, which was apparently decided as a pure question of law.

Though the Bankruptcy Court made no factual findings, which Federal Rule of Civil Procedure 52 (and Federal Rule of Bankruptcy Procedure 9014) require be made explicitly, the District Court apparently employed the "implicit-finding" rule to presume the Bankruptcy Court did so anyway, even though this Court rejected that approach in *ENI US Operating Company, Inc. v. Transocean Offshore Deepwater Drilling, Inc.*, 919 F.3d 931, 934 (5th Cir. 2019). The District Court then affirmed

the Bankruptcy Court's ruling by improperly applying clear error review instead of the *de novo* standard both sides had agreed was appropriate for a question of law, which is what the Bankruptcy Court actually decided.

This matters because the Bankruptcy Court's ruling misunderstands and misapplies the applicable law. The meaning and components of a contract are determined by contract law, not by bankruptcy law or by retroactive rewrites to benefit a debtor. Under the freedom of contract, parties may agree that subordinate contracts are indivisible from a master contract. That is exactly what the parties to the Supply Agreement did, and neither the Debtors nor the Bankruptcy Court may "separate the wheat from the chaff" to create a more advantageous contract for the Debtor. *Thornhill*, 85 F.4th at 326. This is particularly true here, because Hong Kong law disfavors divisibility.

The intent of the parties to this Supply Agreement could not be clearer. The Supply Agreement's plain language stipulates that purchase orders are an incorporated part of the Supply Agreement, including when the Supply Agreement is assigned. Although the language of the contract is sufficient to understand the parties' intent,

the parties' course of performance confirms the Supply Agreement's language, which was expressly cited to and followed by the parties, particularly when indemnity was being sought. There is literally no evidence in the parties' course of performance, before or during the Bankruptcy Case, that they ever treated purchase orders as divisible from the Supply Agreement or considered them to have any independent legal significance. The Bankruptcy Court's attempt to splice the Supply Agreement and its purchase orders into a more desirable arrangement for the Debtors violates Section 365, well-established bankruptcy law, and the settled expectations of the parties when they entered into the Supply Agreement.

In sum:

- Sophisticated commercial parties are allowed to define what constitutes their entire agreement for the purposes of assignment;

- Courts are required to enforce the parties' agreed upon definition of what constitutes their entire agreement;

- The Supply Agreement unambiguously addressed this precise question (as framed by the Bankruptcy Code and in the context

of an assignment) and the parties entered into a Pre-Petition Assignment Agreement showing exactly how the parties intended to proceed when assigning the Supply Agreement;

- The Debtors and Midea then followed that same approach during the Bankruptcy Case when assuming and assigning the Supply Agreement and addressing the related cure amount pursuant to Section 365 of the Bankruptcy Code;

- The parties' course of performance both prior to and during the Bankruptcy Case confirms the unambiguous intent of the parties memorialized in the Supply Agreement; and

- Neither the Bankruptcy Court nor the District Court found the Supply Agreement to be ambiguous.

Allowing the Bankruptcy Court's Objection Order ruling to stand would not only eviscerate this Court's *Thornhill* decision, but also cast every contract that includes purchase or work orders into doubt. Any existing contract counterparty may be shocked to learn that it now has obligations under distinct contracts, rather than the fully incorporated, master contract that its executives negotiated and executed. Despite having specifically bargained to have only one Customer to whom it owed

indemnity obligations, suppliers like Midea must now have as many potential Customers as the number of shipments they made, with possibly conflicting demands for different customers' indemnity rights. Under fundamental principles of contract law, businesspeople who plainly state their intentions in writing must have their intentions respected. The Bankruptcy Court's Objection Order refused to do this and cannot stand.

Because the meaning of a contract is a question of law, and particularly since Hong Kong law disfavors divisibility, this Court should recognize and apply the correct, stated intent of the parties to the Supply Agreement, reverse the Objection Order, and render judgment in Midea's favor. As already acknowledged, doing so will in no way require unwinding the Debtors' Plan, the Confirmation Order, or otherwise jeopardize the Debtors' restructuring.

If, in the alternative, this Court determines that factual findings are necessary, this matter should be remanded to the Bankruptcy Court for those findings to be made, to allow the parties to be heard on those proposed findings, and for the Bankruptcy Court to clarify its decision accordingly.

## STANDARD OF REVIEW

This Court reviews the legal conclusions of lower courts *de novo* and their findings of fact for clear error. *21st Mortg. Corp. v. Glenn (In re Glenn)*, 900 F.3d 187, 189 (5th Cir. 2018); *Tummel & Carroll v. Quinlivan (In re Quinlivan)*, 434 F.3d 314, 318 (5th Cir. 2005). Because the district court itself sat as an appellate court, "the weight we assign to the district court's conclusions is subject to [this Court's] discretion." *In re Perry*, 345 F.3d 303, 309 (5th Cir. 2023).

In cases involving mixed questions or law and fact, the Court similarly exercises de novo review. *Larbie v. Larbie*, 690 F.3d 295, 306 (5th Cir. 2021) ("[A] mixed question of law and fact [is] subject to de novo review."). "When a finding of fact is premised on an improper legal standard, or a proper one improperly applied, however, that finding is reviewed *de novo*." *Suggs v. Stanley (In re Stanley)*, 224 F. App'x 343, 346 (5th Cir. 2007) (quotations omitted).

# ARGUMENT

## I.     The Supply Agreement Incorporates All Purchase Orders into an Indivisible Contract.

### A.     Purchase / Work Orders Issued Pursuant to a Master Contract are Indivisible from the Master Contract When the Parties So Intended.

The law of contracts, not bankruptcy, governs the interpretation of a contract in a bankruptcy case, including on appeal. *See In re Kris-Jenn, Ranch, LLC*, 661 F. Supp. 3d 654, 670 (W.D. Tex. 2023) (citing *In re EnergyTec*, 739 F.3d 215, 221 (5th Cir. 2013)).

The Supply Agreement is governed by Hong Kong law, and thus purchase orders issued pursuant to the Supply Agreement are too.  Hong Kong courts "are somewhat reluctant to divide a contract unless such is clearly seen to be intended[.]" Michael J. Fisher & Desmond G. Greenwood, *Contract Law in Hong Kong* 363 (3d Ed. 2018).  Hong Kong contract law otherwise appears to conform with that of the forum state, Texas, and when this is the case, federal courts in Texas default to the law of the forum state on the remaining issues.  *Schneider National Transport v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002).  Thus, it is appropriate to apply Texas contract law of sales, coupled with the skepticism of Hong Kong law toward contract divisibility.

A divisible or severable contract "includes two or more promises which can be acted on separately such that the failure to perform one promise does not necessarily put the promisor in breach of the entire agreement."[9] *Stewart Title Guar. Co. v. Old Republic Nat. Title Ins. Co.*, 83 F.3d 735, 739 (5th Cir. 1996).  As the Northern District of Texas explained:

> Under Texas law, a contract's severability depends on three factors: (1) the intent of the parties, (2) the subject matter of the agreement, and (3) the conduct of the parties. . . .  The first factor in the three-prong test for determining the severability of a contract, the parties' intent, is given the greatest weight.

*In re Wolflin Oil, L.L.C.*, 318 B.R. 392, 397 (Bankr. N.D. Tex. 2004).

"[T]wo or more contracts or leases may be part of one integrated transaction.  When agreements are integrated, a party may not assume one agreement without also assuming all other integrated agreements." *EPLET, LLC v. DTE Pontiac North, LLC*, 984 F.3d 493, 504 (6th Cir. 2021) (finding two nominally separate agreements to be part of a single integrated contract that must be assumed and assigned together under Section 365) (quotations and citations omitted); *see also In re Philip*

---

[9] This brief favors the term "divisible" because severability can also confusingly refer to the removal of void / illegal contractual provisions, which is not an issue here.  *See, e.g., In re OCA, Inc.*, 552 F.3d 413, 423–24 (5th Cir. 2008).

*Services (Delaware), Inc.*, 284 B.R. 541 (Bankr. D. Del. 2002), *aff'd* 303 B.R. 574 (finding merger agreement and promissory note agreement were intended to be single integrated agreement and therefore both must be assigned under Section 365).  The parties' intent controls the question of divisibility.  *See, e.g., EPLET*, 984 F.3d at 505.

The parties *may* intend divisibility when a contract addresses two independent subject matters, or when a contract is broken down into phases, the performance of which the contract requires to be evaluated separately.  *Stanley Works v. Wichita Falls Indep. Sch. Dist.*, 366 S.W.3d 816, 827–28 (Tex. App. 2012).  However, a supply contract does not become divisible simply because it involves a series of sequential performances.  For example, the parties may not have been willing to proceed on a performance-by-performance basis.  *See Coon v. Schoeneman*, 476 S.W.2d 439, 443 (Tex. Civ. App. 1972), writ refused NRE (May 17, 1972).  The fact that payments are made for each aspect of performance does not automatically make the contract divisible either.  *Johnson v. Walker*, 824 S.W.2d 184, 187 (Tex. App. – 2d District 1991), writ denied (Jan. 29, 1992).  A contract built around a core subject matter

with an "entire bundle of rights and duties included therein" is not properly seen as divisible. *Id.*

Because Texas has substantial mineral resources, its courts are quite familiar with master services and supply contracts, by which parties who anticipate a series of related transactions agree to a master arrangement providing umbrella terms for subsidiary transactions. For example, in *Shell Western E & P, Inc. v. Pel-State Bulk Plant, LLC*, 509 S.W.3d 581 (Texas Ct. App. 2016), the parties agreed to a mineral lease that contemplated various subordinate contracts as part of the intended mineral extraction. When some of these activities went unpaid, the parties disputed whether those contracts were properly viewed as part of the master services agreement or as divisible supply contracts with independent legal significance. The Texas Court of Appeals held they were indivisible, relating as they all did to a master services contract.

Shell Western contended that "the fracking agreement was nothing more than 'an agreement to agree' on future work." *Id.* at 588. The Court of Appeals disagreed, noting that the work orders were specifically contemplated by the master services agreement for the purpose of implementing one overall goal. The master agreement contained

detailed, negotiated provisions on safety, guarantees, and payment. Furthermore, the terms clearly stated the parties' intent to make work and purchase orders subordinate to the agreement:

> "If there is a conflict or contradiction between this Contract and any . . . related purchase order, the Contract shall prevail."

> Nowhere does the fracking agreement state that each well is a separate contract; not does it state that each work order . . . is a separate and independent contract.

*Id.* Therefore, these "multiple documents pertaining to the same transaction constituted one contract." *Id.* (collecting Texas authorities).

Of course, the parties are free to establish a master contract that works otherwise. In the bankruptcy proceedings for *In re Hawker Beechcraft, Inc.*, No. 12-11873, 2013 WL 2663193 at *3 (Bankr. S.D.N.Y. June 13, 2013), the parties designed a very different master agreement, where the parties specifically agreed that purchase orders would be divisible, independently enforceable contracts. As a result, purchase orders issued pursuant to that master agreement were separate contracts that could be assumed or rejected individually. Critical indicators of the parties' intent included (1) a specific carve-out of purchase orders from the master agreement's definitions section; (2) the master agreement giving the supplier no discretion over whether to fulfill

purchase orders; and (3) the integration clause in the master agreement specifically excluding purchase orders from its operation. *Id.* at *5–6.

**B. Here, both the Plain Language of the Supply Agreement and the Parties' Course of Performance Confirm Purchase Orders are Indivisible.**

    1.   <u>The Supply Agreement Repeatedly Indicates that Purchase Orders are Indivisible and Subordinate</u>.

The plain terms of the Supply Agreement are replete with indications that these parties, like the parties in *Shell Western*, intended their purchase orders to be an integrated component of the Supply Agreement and not divisible, freestanding agreements. One telling provision is Section 17.7, which states:



ROA.13345 (emphasis added). Courts have found that similarly detailed integration clauses were sufficient to find that the parties intended purchase orders to be part of a single integrated and indivisible agreement. *See, e.g.*, *Battle Born Munitions*, Case No. 22-1005, 2023 WL 4758449 at *6 (3d Cir. July 26, 2023) ("In light of the integration clause

and description of all essential terms, the Vendor Agreement and all subsequent purchase orders are properly understood as being integrated."); *Charleston Marine Container Inc. v. Sherwin-Williams Company*, 165 F. Supp. 3d 457, 465 (D.S.C. 2016) ("[I]t is clear plaintiff regards the purchase orders as enforceable contracts, separate from the Supply Agreement. . . . [T]he court finds that the purchase orders deal with the same subject matter as the supply agreement — namely, the purchase and sale of paint, coatings, and related products. Thus, enforcing the purchase orders would run afoul of the integration clause declaring the Supply Agreement to be the final expression of the parties' agreement on the subject matter and prohibiting any modification by the plaintiff's purchase orders."); *see also Philip Servs.*, 284 B.R. at 546.

Further evidence of the parties' understanding is contained in Section 17.2, which provides:



(ROA.13345) (emphasis added). The parties' requirement that the Supply Agreement be assigned only in its entirety mirrors the requirements of 11 U.S.C. § 365(f) and this Court's decision in *Thornhill Bros. Fitness*, 85 F.4th 321 (5th Cir. 2023).

But what does it mean to assign the Supply Agreement in its entirety? The parties by agreement defined that too. The terms of the Supply Agreement explicitly refer to "this Agreement in its entirety (including all purchase orders and PIs)." Under Texas law, contracts must be construed to give meaning to all their terms, and not read to make any terms redundant or ineffective. *See, e.g., WBCMT 2007 C33 Office 9720, LLC v. NNN Realty Advisors, Incorporated*, 844 F.3d 473, 478 (5th Cir. 2016) ("Texas courts thus examine the entire contract in an effort to harmonize and given effect to all provisions so that none is rendered meaningless.") (citations and quotations omitted).

Moreover, the term "including" was intentionally utilized to provide further transparency as to how the parties intended the "entire agreement" to be defined and interpreted. The term "including" means

"part of" whatever preceded the term. *P.C. Pfeiffer Co, Inc. v. Ford,* 444 U.S. 69, 77 n.7 (1979) ("The petitioners' argument supposes that the word 'including' means 'and' or 'as well as.' We understand the word 'including' to indicate that 'longshoring operations' are a part of the larger group of activities that make up 'maritime employment.'); *see also Stonegate Fin. Corp. v. Broughton Maint. Ass'n, Inc., No.* 02-18-00091-CV, 2019 WL 3436616, at *5 (Tex. App. July 30, 2019) (citing BLACK'S LAW DICTIONARY 880 (10th ed. 2014) defining "include" to mean "[t]o contain as part of something").

Thus, the parties' Supply Agreement is the opposite of the contract at issue in *Hawker-Beechcraft*, and even more aggressive in its rejection of divisibility than the *Shell Western* contract. To compare the most obvious differences:

| **Midea Supply Agreement** | **Hawker-Beechcraft Agreement** |
|---|---|
| Purchase Orders Deemed to Incorporate the Supply Agreement | Purchase Orders Exempt from Supply Agreement Definitions |
| Supplier "May" Issue Invoice to Fulfill Purchase Order | Supplier Has No Discretion to Refuse Purchase Order |
| Integration Clause Specifically Incorporates Purchase Orders | Integration Clause Specifically Excludes Purchase Orders. |

As in *Shell Western*, the Supply Agreement makes purchase orders subject to the Supply Agreement's terms regardless of whether the Supply Agreement is mentioned.  There is no provision of the Supply Agreement providing that purchase orders shall be treated as separate contracts, or that each shipment shall be treated as divisible.  *Compare Shell Western*, 509 S.W.3d at 588.

Indeed, the Supply Agreement went well beyond *Shell Western* to ensure that the incorporation of the purchase orders, and the Supply Agreement's limitation on Midea having one sole Customer to whom Midea was responsible, must survive assignment of the Supply Agreement.   Section 17.2 requires ███████████████████████ ██████████████████████████████████████████████ ████████████████████████████████  The Supply Agreement could only be assigned together with all purchase orders, because anything less would be less than the entire Supply Agreement.  The other side of the same coin is that assigning "the Supply Agreement" meant assigning all purchase orders as well, since they were always understood as part and parcel of the Supply Agreement.

The indivisible nature of the purchase orders is further cemented by the Supply Agreement's statement that the overall purpose of the Supply Agreement is for Midea to sell Debtors ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

(ROA.13333).

The purchase order provision of the Supply Agreement is simply a mechanism for communicating and fulfilling orders, one facet of the single overall purpose of the Supply Agreement — to facilitate the manufacture and sale of Instant Brands appliances from Midea to Debtors. The Supply Agreement provides a highly structured set of rules and procedures with respect to the fulfillment of any purchase order and the possibility of cancelling one or more purchase orders. Far from indicating that the purchase orders are separate contracts, these provisions confirm that they are integrated and completely dependent on the Supply Agreement for their intended meaning. *Compare Battle Born*, 2023 WL 4758449 at *6 ("Although some terms, like price and quantity, are contained in the purchase orders, the Vendor Agreement defines

those terms in relation to such purchase orders. . . . The Vendor Agreement, and therefore any subsequent purchase order, also incorporates the Routing and Transportation Guide for Dick's Sporting Goods, which presumably set the essential terms for delivery.").

2. The Parties' Course of Performance, Especially on Indemnity, Confirms the Parties' Intent.

Although not necessary to understand the parties' intent, the parties' undisputed course of performance confirms what the Supply Agreement says. *See* TEX. BUS. & COM. CODE ANN. § 2.202 (noting that evidence of course of performance may confirm what a contract already says). Here, the Debtors and Midea always treated the Supply Agreement and the purchase orders as a single integrated agreement. This is most apparent from their conduct in the Pre-Petition Assignment Agreement, which was executed between two Debtor entities (Instant Brands Inc. and Instant Brands LLC), and signed and agreed upon by Midea.

Consistent with Section 17.2 of the Supply Agreement (as outlined above), the Pre-Petition Assignment Agreement defined the "Assigned Contract" as "that certain contract as described on Schedule 1 attached hereto," which Schedule 1 only included the Supply Agreement.

- 49 -

(ROA.13353, 13360).  No purchase orders were attached or mentioned anywhere in the Pre-Petition Assignment Agreement, even though both sides added a new provision to ensure that, in this one instance, the previous Customer's benefits and obligations would transfer and be assumed by the new Customer (the assignee).  This was because the purchase orders not only had no legal significance of their own, but were by definition fully incorporated into the Supply Agreement.  Under the Bankruptcy Court's "completed contract" theory of divisibility, the Pre-Petition Assignment Agreement makes no sense at all.

The Debtors' own actions further confirm this understanding.  In the Debtors' initial notice of potential assumption and assignment of executory contracts, the Debtors identified the Supply Agreement with Midea.  The Debtors ascribed the corresponding cure amount (i.e. the amount owed and outstanding by the Debtors under the Supply Agreement) to be $11,111,684.49.  (ROA.869).  Despite that amount representing the aggregate outstanding balance of numerous open purchase orders issued pursuant to the Supply Agreement, the Debtors did not list any of these purchase orders with Midea for possible assumption and assignment.

The fact that the Debtors listed Midea as being owed over $11 million under the "Supply Agreement" is irreconcilable with the Bankruptcy Court's subsequent assertion that the Supply Agreement serves only as a framework while the purchase orders are discrete contracts embodying individual purchase and sale agreements. The Debtors' own filings show that they have always understood all purchases and sales to occur through and be governed by the Supply Agreement. The Debtors only deviated from this understanding well into the Bankruptcy Case, when it became apparent that they needed to find another argument for why indemnity rights under the Supply Agreement should somehow be divisible from the Supply Agreement itself.

The behavior of the Debtors during the actual Appliances Sale is particularly telling. Keep in mind that the "completed contract" argument ultimately adopted by the Bankruptcy Court did not come from Debtors, but from the Ad Hoc Group of Crossover Lenders. (ROA.10995). The Crossover Lenders were not parties to the Supply Agreement and had no basis to know what the parties to the Supply Agreement intended. Yet, they championed the argument anyway, claiming that the purchase orders were severable as a matter of law, an argument that the

Bankruptcy Court incorrectly adopted. Debtors only climbed on board after their earlier attempts — splicing the Master Assignment Agreement, "matured indemnity rights," "contingent interests," and purchase orders with occasional additional terms and conditions — each fell flat.

In the experience of undersigned counsel, arguments that reflect the truth of a party's beliefs about an agreement are offered at the first available opportunity, not the third go-round after the first few strategies failed. Such arguments are also advanced by the parties who have personal knowledge of their mutual intent and how they conducted themselves, not by some third party who, lacking any such foundation, conceives a moonshot strategy at the midnight hour. Although the language of the Supply Agreement and the course of the parties' dealings tell this Court what it needs to know, Debtors' conduct during the bankruptcy proceedings confirms that this reliance on purchase orders is a mere litigation strategy, not a reflection of what the parties to the Supply Agreement ever believed, or had any reason to believe.

### C.   The Bankruptcy Court Erred in Finding the Agreement's Completed Purchase Orders to be Divisible.

The Bankruptcy Court ruled, as a matter of law, that completed purchase orders are automatically separable from an executory supply contract. The Bankruptcy Court's holding was issued on the record as a preliminary finding that later became final:

> There is very little question in my mind that the purchase orders are separable contracts under applicable law, such that the assumption and assignment of the agreement did not assume and assign completed purchase orders. . . . It's a non-executory, separable agreement.

(ROA.10472, 10493 (adopting ruling as final)).

The Bankruptcy Court cited no authority to support its assertion that completed purchase orders were automatically divisible from the Supply Agreement, regardless of what the Supply Agreement itself said or what the parties intended.

The Bankruptcy Court did distinguish purchase orders that had been *completed*, seemingly finding that upon completion these purchase orders automatically became separate, stand-alone, non-executory contracts. At the February 9, 2024 hearing, the Bankruptcy Court attempted to explain its view:

> If a completed purchase order is an independent contract,
> then they can have an assignment – that was an "if." They
> can then assign the supply agreement, but have a separate
> contract that might still have the indemnity provision or that
> does still have the indemnity provision under their argument
> under the very terms of the assigned contract. It is a
> separable and separate contract, which by the way in my view
> today is no longer executory. It's just a contract where there's
> only a unilateral obligation on your client's part to provide
> indemnity if they're corrected. It's a separable contract."

ROA.10378. According to the Bankruptcy Court, a purchase order is

completed when there is no remaining payment obligation by the

Customer (and only a contingent indemnity obligation of the Supplier).

But this distinction, even if accepted, simply ratifies the parties'

intent and course of performance, as the Debtors never scheduled a single

open purchase order on their notices of assumption and assignment or

the schedule to the Appliances APA, nor did the Debtors attempt to retain

indemnity rights under purchase orders when they secretly tried to

carve-out indemnity claims through MAA 2.0. The Debtors understood

open purchase orders existed at the time of sale and they nonetheless

chose never to reference them anywhere. Why? Because they never

viewed open purchase orders as separate executory contracts divisible

from the Supply Agreement. Nor did they ever view completed purchase

orders as separate non-executory contracts as evidenced by the absence

of any reference to purchase orders in MAA 2.0. Indeed, MAA 2.0 expressly carves out rights to assert "Retained Supply Agreement Claim[s]" — not purchase order claims.

Further, the Supply Agreement, which dictates the role of purchase orders, makes no such distinction: to the contrary, it states, twice, that purchase orders are fully integrated into it, *expressly including when it is assigned.* And the failure of a master agreement to specifically describe purchase or work orders as divisible is compelling evidence that such orders were intended to be indivisible. *Compare Shell Western*, 509 S.W.3d at 588 (no description of orders in master agreement as divisible, thus they are not) *with Hawker-Beechcraft*, 2013 WL 2663193 at *6–10 (purchase orders specifically described in master agreement as divisible, therefore they are).

The Bankruptcy Court may have conflated the circumstances under which a contract can be assigned during bankruptcy with the quite different concept of what an assignable executory contract *was previously defined by its parties to incorporate.* An assumed executory contract must be assigned "in its entirety," *see Thornhill*, 85 F.4th at 326, but a contract's entirety is determined by what the parties to that contract

agreed to include, not what some court later decides would be convenient for a debtor. *See Stewart Title*, 83 F.3d at 739.

The Bankruptcy Court's decision is particularly incompatible with this Court's decision in *Thornhill*, in which this Court rejected another attempt by a debtor to rewrite the indemnity provisions of a contract. *See Thornhill*, 85 F.4th at 326. The instant case demonstrates why debtors keep trying to manipulate contractual indemnity: if they succeed, debtors can retain liabilities, driving up the sale value of now free-and-clear assets, while sticking somebody else with the bill — exactly what Debtors tried to get away with here. But executory contracts must be taken as they are, not how a bankruptcy court or a debtor feels they could be improved. *See id.*

The Bankruptcy Court's view that that completed purchase orders should always be divisible from a master agreement is a permissible contract to write — if the parties agree to it. The parties here agreed to exactly the opposite, and their expressed intent is the final word under contract law on what constitutes the Supply Agreement when it is assigned. Here, that Supply Agreement includes the purchase orders, whether they are deemed open, completed, or somewhere in between.

**D.    The District Court Erred in Applying Deferential Review to the Bankruptcy Court's Determination that Purchase Orders were Severable.**

1.    <u>The Bankruptcy Court's Decision was decided as a Question of Law, not a Question of Fact.</u>

At the Bankruptcy Court's invitation, the interested parties stipulated to a factual record that contained the Supply Agreement, as well as representative examples of purchase order submissions and tenders of claims under the indemnity provisions of the Supply Agreement.  The Bankruptcy Court then determined the divisibility of purchase orders under the Supply Agreement strictly as a matter of legal principle.

The Bankruptcy Court made no express factual findings at all, and at no time did it interpret any provision of the parties' Supply Agreement or purport to find meaning in the parties' course of performance (either prior to or during the Bankruptcy Case).  If the Bankruptcy Court had made factual findings, then the case would need to be remanded so the parties and this Court can find out what those findings were and determine if they are supported by substantial evidence in the stipulated record.  *Eni US Operating Co., Inc. v. Transocean Offshore Deepwater Drilling, Inc.,* 919 F.3d 931, 937 (5th Cir. 2019).

- 57 -

But there is no need for factual findings if the facts point in only one direction, and only their legal significance needs to be determined. That describes the record in this case, and it is why no party has ever claimed the Bankruptcy Court made any factual findings, because it simply did not do so.[10]  No party has claimed any relevant portion of the Supply Agreement to be ambiguous, nor has any party claimed that extrinsic evidence is necessary to understand what the Supply Agreement says.  The parties have stipulated that the purchase order exchanges and indemnity tenders contained in the record are representative of all their interactions, and these documents say what they say.  In the case of the indemnity tenders, the exchanges followed the same script every time.

If the language of the contract is straightforward, there typically is no need to consider extrinsic evidence.  If extrinsic evidence is considered, such as the parties' course of performance, there is no fact issue when the extrinsic evidence says the same thing as the intrinsic language of the contract.  In that case, interpreting the contract is a purely legal issue,

---

[10] This is why both sides agreed in open court that there was no need for issuance of formal Findings of Fact, because the Bankruptcy Court never made any. (ROA.10504–10505).

*Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004), and this is why the Bankruptcy Court did not make any factual findings.

   2. <u>The District Court Incorrectly Describes the Bankruptcy Court's Holding as a Finding of Fact, and Improperly Defers to its Legal Holding.</u>

The District Court decision misses the mark on multiple levels.

First, the District Court's decision uses the wrong standard of review, reviewing the Bankruptcy Court's legal conclusion deferentially for clear error, not *de novo* as required. The District Court reviewed the alleged factual record itself, but only selectively, and purely to determine whether the Bankruptcy Court's finding of divisibility had some basis in the record — a concept that makes no sense, because legal conclusions are reviewed *de novo*, not on a grading curve.

Second, the District Court's decision hinges on its interpretation of this excerpt from *Chapman v. Tyler Bank & Trust Company*, 396 SW 2d 143, 147, Court of Civil Appeals of Texas, 1965):

> Although the trial court did not specifically find that the "Pike" contract was divisible and a separate contract, the judgment in favor of the Tyler Bank supplied the finding by implication and there being evidence of probative force in support thereof, such implied finding is binding upon the appellate court.

The terms "find" and "finding" are sometimes used loosely to reference either factual or legal conclusions, and this seems to be one of those occasions. A "finding" of divisibility is a legal conclusion about the meaning of a contract reviewed *de novo*, not a finding of fact. To the extent facts were found while reaching that conclusion, the issue presents a *mixed* issue of law and fact, which also is reviewed *de novo*. *See Larbie*, 690 F.3d at 306.

But the District Court was forbidden from taking even this approach. In this Circuit, an appellate court may not infer a lower court's factual finding on anything. *Eni US Operating Co., Inc. v. Transocean Offshore Deepwater Drilling, Inc.,* 919 F.3d 931, 937 (5th Cir. 2019). Factual findings must be explicit, and if they do not appear in the lower court's decision, but were required to be made, the case must be remanded for the lower court to state its reasoning; the appellate court does not simply get to assume what the found facts might have been.

It is telling that the District Court identified no fact supposedly found by the Bankruptcy Court. (Nor could it, as the Bankruptcy Court made none). Rather, it treated the entire holding of divisibility as one of fact (which it is not), and scoured the record for contractual terms or

party conduct that *plausibly* supported the Bankruptcy Court's conclusion, all to conclude that the Bankruptcy Court "did not clearly err." But this turns the process on its head. Reviewing courts defer to specific findings of fact, not to legal conclusions that the reviewing court hopes had some factual support, somewhere. It is the District Court that has "clearly erred."

The District Court's review of the record was also one-sided, unreasonable, and contrary to law. The District Court completely ignored both provisions in which the Supply Agreement explicitly directs that purchase orders are not only deemed incorporated into the Supply Agreement, but also specifically incorporated for the purposes of any assignment. (ROA.13345). It is inconceivable that a decision on contract divisibility could ignore the two provisions that directly address that issue.

And the mere fact that purchase orders had culminated in separate sub-agreements for varying amounts of product is meaningless. As *Shell Western* and various authorities point out, such purchase orders would be meaningless without the Supply Agreement's authorizations, procedures, and protections, including the right to use the Customer's

intellectual property and branding, under which those purchase orders are fulfilled. 509 S.W.3d at 588. Indeed, the approach of the courts below utterly swallows the rule, making every supply or minerals agreement divisible as a matter of law, anytime there are completed work or purchase orders, ***even if the parties explicitly agreed that would not be the case***. The law is the exact opposite.

## II.     The Bankruptcy Court's Ruling Would Create Untenable Uncertainty Among Contracting Parties.

The Bankruptcy Court's Objection Order must be reversed because it is legally wrong and improperly overrides the expressed intent of the parties to the Supply Agreement. However, the Objection Order is unacceptable on even broader grounds, standing for the proposition that parties to carefully negotiated, commercial contracts can no longer rely on their own understandings once reduced to writing, and instead must be resigned to bankruptcy courts rewriting their contracts (potentially years later) into agreements that neither side ever contemplated. This precept is untenable and constitutes independent grounds for reversal of the Objection Order.

As outlined above, the proper standard for determining whether a contract is divisible is to discern the intent of the parties. This analysis

focuses on the text of the agreement itself, but also benefits here from the (here conceded) course of performance and context of the entire transaction. *See, e.g., Philip Services,* 303 B.R. at 576–77 (D. Del. 2003); *EPLET*, 984 F.3d at 505; *Ferguson*, 183 B.R. 122, 125. The Objection Order did none of those things, instead substituting the Bankruptcy Court's own views on how purchase orders *ought* to be divisible from supply agreements once "completed" versus the agreements made by the contracting parties and their explicitly stated intent in doing so.

The province of the courts is to reduce uncertainty with respect to the law, not foment it. Nowhere is that truer than with contract law, which is supposed to be the law of settled expectations, particularly among sophisticated parties who, unlike the courts, understand how their businesses need to work. Certainly Midea could not have foreseen when its executives specifically bargained for complete incorporation of all purchase orders into the Supply Agreement, and further bargained for those incorporated orders to be included when the Supply Agreement was assigned so as to only ever have one Customer, that a bankruptcy court would unilaterally reinterpret the Supply Agreement to mean

something more convenient for a debtor, resulting in a bewildering and costly set of ongoing obligations for every purchase ever placed.

That was not the bargain that was struck, nor did Midea or the Debtors ever understand it to be such. The Objection Order saddles Midea with new obligations made of whole cloth, instead of honoring the ones that the parties set down within the four corners of the Supply Agreement.

The Objection Order and the District Court Judgment affirming it should be reversed, and judgment rendered in favor of Midea. In the alternative, should this Court deem explicit factual findings to be necessary — which Midea believes they are not — this matter should be remanded to the Bankruptcy Court to make those findings through an orderly process, with its Opinion to be updated accordingly.[11]

## **CONCLUSION**

Midea and its Customer intended the Supply Agreement both to govern all their commercial dealings and to fully incorporate and supersede any purchase orders ever issued by Midea's Customer. Midea

---

[11] Should the Bankruptcy Court's Order be affirmed, proceedings would need to continue on Court IV of Midea's Adversary complaint. If Midea prevails, count IV is moot.

and its Customer confirmed this intent in their everyday performance, especially when applying the indemnity rights conferred upon, and only upon, the one Customer with whom Midea was currently in business.

Midea's Supply Agreement may have been inconvenient for Debtors, but they cannot use the bankruptcy process to rewrite an executory contract into something more desirable. Debtors and their assignees must take executory contracts as they are, and under the Supply Agreement, the parties agreed that purchase orders would be fully integrated, not divisible and that Midea's obligations belong solely to one Customer, the party to which Debtors sold and assigned the Supply Agreement.

The decision of the District Court should be reversed, and this matter should be remanded for entry of judgment in favor of the Appellants Midea. If additional proceedings are required, the Court should reverse and remand for those proceedings to move forward.

Respectfully submitted,

Dated: July 23, 2025

**ARENTFOX SCHIFF LLP**

*Counsel for Appellants Midea*

By:  */s/ Brett D. Goodman*

Brett D. Goodman
1301 Avenue of the Americas
42nd Floor
New York, New York 10019
Telephone: (212) 484-3900
brett.goodman@afslaw.com

and

Matthew F. Prewitt
Neil Lloyd
233 S. Wacker Dr., Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5583
matthew.prewitt@afslaw.com
neil.lloyd@afslaw.com

and

James E. Britton
800 Boylston St., 32nd Floor
Boston, MA 02199
Telephone: (617) 973-6204
james.britton@afslaw.com

-and-

**HOWLEY LAW PLLC**

Tom A. Howley
Texas Bar No.  24010115
Eric Terry
Texas Bar No.  00794729
711 Louisiana St., Suite 1850
Houston, Texas 77002
Telephone:  713-333-9125
Email:  tom@howley-law.com
Email:  eric@howley-law.com

# CERTIFICATE OF SERVICE

I certify that on July 23, 2025, a copy of this document was served via electronic mail on all counsel of record via the Court's CM/ECF system.

/s/ *Brett D. Goodman*
Brett D. Goodman

## **CERTIFICATE OF COMPLIANCE**

I, Brett D. Goodman, a member of the Bar of this Court and counsel for appellants Midea, certify, pursuant to Federal Rule of Appellate Procedure 32(g), Federal Rule of Appellate Procedure 27(d)(1)(E), and Fifth Circuit Rule 32.3, that the attached Appellants' Opening Brief is proportionately spaced, has a typeface of 14 points or more, and contains 12,996 words.

*/s/ Brett D. Goodman*
Brett D. Goodman